Our final case this morning is number 20-2218, Vought M8 LLC v. Sony Corporation of America, Mr. Andre. Thank you, Your Honor. May it please the Court. We have two discrete and independent issues on appeal that I'd like to discuss this morning. The first being, can a district court use its own pleading standard that is in direct contradiction to this court's pleading standards in dismissing a complaint? Mr. Andre, hi. This is Judge Dyke. I think you have some good arguments that the district court heard in dismissing the 990, 988, and 670 aspects of the complaint. But with respect to the 540 allegations, it strikes me that you have a bit of a problem, because the only allegation that comes close to satisfying the claim language concerns the hard drive. And I think, as I understand the complaint, it is alleged that the hard drive is part of the motherboard. So why don't you have a problem with the 540? Your Honor, with respect to the 540 at the pleading stage, we pled that the board that held the memory and the authentication program was separate and distinct from the motherboard and was not part of it. It was a separate hard drive. We also indicated that there were three different components that could satisfy that first claim element, the board which has a memory and the authentication program. Wait, where did you... Counsel, you just... I'm confused. You just told Judge Dyke that you actually pled that it was separate from the motherboard, but the First Amendment complaint says that it's allegedly in the PS4 motherboard. But it's operating separately from the motherboard itself. So if you look at the actual... the way it is set up, there are three different components that can act as the board, including the memory. We said it can be the hard drive, it can be the disk, and it can also be the network. And we identified three separate allegations that we believe satisfy that first claim element. I'm not understanding that. If you look at 633 of the appendix in paragraph 74, it talks about an authentication program being in these three separate places, but I don't see where there's an allegation that the game program is found in each of those three. So looking at the appendix starting at page 636, you see that first we talk about the board itself being the hard drive. We enumerate that there's memory on the hard drive and the authentication program there. If you go down to page 637, the second chart talks about a Blu-ray disc containing game software that's inserted into the PlayStation 4 acting as a board as well. Well, wait, wait, wait. I don't see where the Blu-ray, for example, is alleged to contain the game program. It actually has the, if you look on page 637, the second chart down, you'll see that it says a PlayStation 4 Blu-ray disc containing game software that is inserted into the PlayStation 4 console. So it actually has the game software on it, and we have multiple sites that show that the game comes off a proprietary CD-ROM disc. And we actually quote from the websites regarding that. So that's in that second chart. What do you mean second chart? I'm looking at 637. What do you mean second chart? There are two charts on each page the way it's set up. I'm not understanding what you're saying. Where on the page do I look? The bottom of that page. Under E? E, that's correct. Yes. You'll see there a PlayStation 4 Blu-ray disc containing the game software is inserted into it. So there we're talking about the Blu-ray disc being a second component that can act as the board, as the memory and the game program, storing the game program with the authentication program as well. Do you see that? Yes. And then if you go down the next page, we talk about the PlayStation Network server also having the board includes memory and the game on it with authentication programs can also be the network server itself. So those are the three distinct components that we allege could satisfy that first element. You allege that the hard drive is part of the motherboard, right? Well, the motherboard is different from the board and it connects to the board. I believe if you look at the section regarding the motherboard itself, it's down several pages to Appendix 640, it begins. We pulled out the motherboard. It contained a memory that is different from the board and reads and stores the game program during execution. We actually allege that the motherboard is different from the board that we described above. It says that the memory is different. It doesn't say the motherboard is necessarily different in terms of what's stored. Well, yes, I think there's different memory obviously, but I think what we're trying to get across here is that the motherboard which is different from the board is connected to the board. And so there's nothing in the claim language that I see that we would allege that they cannot be sitting in the same plane, but they should be connected to each other. So what we would define as a motherboard at this stage of the case is, I think,  Well, what do we do about the fact that you also separately allege that the authentication program is located in the motherboard? So you're saying that these are alternative pleadings, that it might be there and it might not be there? I think what we're saying is that these type of games, you could have multiple authentication programs on here because one of the biggest issues regarding these gaming consoles is authentication and piracy. They put authentication throughout these consoles. They put them on the disk, and they clearly have them on the servers. So it's not mutually exclusive, and it could be an alternative thing, like you said, Judge O'Malley. But I guess my point is at this stage of the pleadings, where we get the actual teardowns of the consoles, we investigated to the extent we could the disk, and obviously the server is much more difficult because that's behind a firewall. This should have been more than adequate to survive the standards that this court set forward for pleadings, both in the NALCO case that we cite extensively, the disk disease case, and Lifetime Industries. When did you do those teardowns? I was very confused by the fact that you told the court at the first conference that you'd already done it, and then you told the court later that you couldn't do it because it wasn't legal. Maybe it's too much tech speak to make sense. We did teardowns before we filed the complaint. We did our extensive Rule 11 analysis before we filed complaints. We take that very seriously. Before the complaint was filed in August of 19, we had done the teardowns and created charts. Teardown is a legal mechanism, and there's companies that can do it for you, where they actually just teardown the actual consoles and go through them. Reverse engineering is a different set of technologies altogether. Reverse engineering is where you try to go in and rip off someone's source code. That's very different. Even if the two are different, it still doesn't explain why you didn't raise the jailbreaking issue earlier. You agree that we're dealing here with the good cause standard of Rule 16, right? For the motion for leave to amend, not on the original dismissal. I understand. Good cause imposes diligence. Why is it that you didn't earlier raise the jailbreaking problem on November 21, for example? To be honest with you, I think it was just a miscommunication. It was very explicit that we had done the teardowns, that we tore down the Sony PlayStation. We thought that's what the court was talking about. Well, so what? You agreed to, he said it's two weeks to file the first amendment complaint adequate, and you said yes, and then so he set the December 5 date. So what's the excuse for not raising the jailbreaking issue at that point, if you thought that that was necessary to file the first amended complaint? We didn't think it was necessary, Your Honor, to be very candid with you. We think that the teardowns provided more than adequate information. It's much greater commitment to do these teardowns and provide an element by element, and to actually require evidentiary proof of infringement of each and every element is completely contrary to this court's standards, and that's what the district court has done. Mr. Andre, this is Judge Lynn. Can you point us to the portions of the proposed second amended complaint that contain the kinds of source code information you couldn't have gotten earlier from your earlier teardown? On the second amended complaint? Yes. Is any of the source code that is there, because a teardown is literally you're not going in and trying to jailbreak the actual console and reverse engineer there's actually explicit language and the statute says you're not allowed to do that with consoles and telephones. I guess I'll reserve the rest of my time. We're not finished yet. Okay. I don't see that you answered Judge Lynn's question where the product of this jailbreaking is reflected in the second amended complaint, which is what I Yes, that was my question, and I didn't get an answer. Let me pull it up. It's passing throughout the second amended complaint. Anytime you see a source code site, let me pull it up. Okay. If you look at I'm looking at the red line, so if you could refer to the red line appendix, that would be helpful. Okay. Let me pull up the 16. Let me find that real quick. It's in the third volume. I'm sorry. I was in the second volume there. Because of the claim charts, they are, I think, extensive. Yes. So, if you look at the Give me the appendix page number. Okay. I'll look at the original appendix, 169091. If you look at the red line, you'll see a lot of the source code there. If we go to volume three, red line, you'll find a comparable page to that. Okay. I mean, I see extensive changes. But I'm having trouble identifying source code or other things that you It was a very Just I'm searching through this. It was a very arduous process. We actually had to go look to see where this had been jailbroken before on the dark web. We also then had to hire someone who could actually do a jailbreak mechanism and confirm that they would not be held liable for doing so. Well, I understand that. But the answer to my question should be at the tip of your tongue. 2588. 2588. Okay. Let me see if I can go. Let me. Bear with me one second. All right. Where on that page? If you look at The reference to the file directory? That's the file directory from the Call of Duty Blu-ray disc. So that's actually a file directory as part of the source code. You can go on through and further see it in 2605 through 2609. This is all part of the source code that you have to go through a jailbreak to get. But, Mr. Andre, this is Judge Dyke, I thought your theory in the second amended complaint was that the authentication program and the game program were on the hard drive and that that's what satisfied the claim limitation and that the hard drive was separate from the motherboard. Am I wrong about that? The board that contains the game- Just tell me whether I'm- Am I wrong about that? You're correct. Okay. Well, then this allegation doesn't have anything to do with this because this is talking about the Blu-ray disc. Where did you rely on the source code to make the central allegation that I just referred to about the hard drive? The Blu-ray disc is an alternative to the hard drive as a board. We have three separate allegations that could satisfy the first claim limitation for board. One is the hard drive, the second one is the Blu-ray disc, and the third is the network. So we have- So when you agreed with me that the second amended complaint relied on both of these things being in the hard drive, that wasn't quite right because you're saying that's not entirely clear. That's one of the allegations that we've alleged. We've gone through- And once again, just to kind of pivot back here a little bit to the basis where we are in this case. I mean, we had filed the complaint in August. Sony had answered in October, and the pleadings were closed at that point. And then the district court required an enhanced pleading standard that was far beyond what's required by this court and actually in direct contradiction to what's in this court. We then went in and showed them our teardown charts that we had done prior to the case. That's the reason we could do it in two weeks. The court then said that was not sufficient and then required us to go do these jailbreak reversed engineering on source code, which we had to do- Required you to do that? Where did the district court require you to do that? In order of when he dismissed the amended complaint, saying that the teardowns were not sufficient. That's not true. This isn't that he required you to jailbreak. He allowed you to do it. He didn't require it. During the hearing, he said we need source code. Sony would not give us the source code. There's no way to get source code because source code is one of the most protected assets of a company. The only way you can do it is through illegal means. That's the reason you have to go to the dark web and find this stuff. This is Judge Lynn. To Judge Dyke's point, it seems to me that what the judge was saying was that, well, you don't deserve another chance, but I'm going to give you a second chance. If you can show me that there was some reason why you couldn't have done this before, I'll give you another chance. And if you need my permission to jailbreak, well, you have my permission for what it's worth. I think that's a different story than the story you're telling now. Well, I believe that the way it came to fruition was that we filed our amended complaint, which had detailed claim charts based on the teardowns we'd done prior to filing the complaint. And after Sony had already answered, the court said that that was not going to be sufficient, that we needed source code or a reverse engineer. And I said, we can't do that under the DMCA. And he said, well, I don't know if I have authority or not, but you have the authority to do so. It was never in my wildest imagination. I could not imagine that in order to file a complaint, you'd have to go in and have actual evidentiary proof of infringement of each and every element, not just an allegation. And as this court has found in this disease and NALCO and Lifetime Ministries, that is not – you don't have to prove your case. Source code is – Mr. Armstrong, I think we're way over our time here, unless my colleagues have further questions for you at this point. I think we'll hear from Mr. O'Quinn. Okay. I'd like to have some resort time on the one-on-one issue. You have no time left at all, but we'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. O'Quinn. Thank you, Judge Dyke. May it please the court, John O'Quinn on behalf of Sony. The district court properly applied precedent to dismiss bot M-8 claims against Sony as either inadequately pled or patenting ineligible subject matter. I think what's important to recognize here is with respect to these particular claims, Could you address the 540 and what Mr. Andre said about that? Yes, Judge Dyke. With respect to the 540 patent, as some of the questions from you and Judge O'Malley have indicated, there were allegations that the authentication was on the motherboard itself. You can see that in Appendix 630, paragraphs 66, 67, and 68. That, of course, is the opposite of what the claims require. The claims here, it's not enough that there simply be an authentication program somewhere. It's got to be on the same board with the game, and that board has to not be the motherboard. And that is exactly what is missing here, at least in terms of any sort of plausible allegation. There are allegations that it's on the motherboard, which under the Ninth Circuit's decision in TRIPS shows that this is really all hand-waving and therefore not entitled to the presumption of truth. And the allegations… Where do we find the allegation that the authentication program is on the motherboard? Which paragraph? It's Appendix 630, Judge Dyke, and in all of paragraphs 66, 67, and 68. Now, even if that wasn't there, we would be making the same argument here, because ultimately what they have to have to open the doors of discovery, as Twombly specifies, is they need to have a plausible basis. You're referring specifically to paragraph 66, where it says, the PlayStation reads an authentication program from the memory of the motherboard? Yes. Yes, Judge Dyke. And so their allegation, and I think it's important to recognize, both for the 540 and for the 990 patent, that there are multiple things in these devices where programs could be stored. So you're not dealing with a situation where there's a single board, and you could infer, well, everything must be on that. In fact, what's purportedly inventive here about both the 540 patent and the 990 patent is that they gather certain things on one board, separate from the motherboard, so as to reduce commercial manufacturing costs. Because they didn't invent motherboards or boards. They didn't invent authentication programs or mutual authentication programs or fault inspection programs. The only thing that's putatively inventive here is the specific configurations on the specific devices. What's your response, Mr. O'Quinn, to Mr. Andre's contention that, well, they may have said that in that one place, but there were alternative pleadings? Well, Judge O'Malley, I don't understand him to be alleging that there are alternative pleadings vis-à-vis the motherboard. And I think what it's perhaps telling is if you look at Appendix 1676, Paragraph 66, the proposed Second Amended Complaint, they now delete the allegations about the motherboard from the proposed Second Amended Complaint. So I don't think it was an alternative. I think they were just guessing that it could be on any possible board in the device, and they didn't think it all the way through because, obviously, alleging it's on the motherboard is inconsistent with what the claims require. And I think there's exactly... Let me ask you a couple other questions. First, just a technical question. The court's order gave them until February 13th to file another amended complaint, and they did file on the 13th, and the court's dismissal said it was on timeliness grounds. So I guess what I'm trying to understand is how could it be untimely if it satisfied the court's deadline? I appreciate the question, Judge O'Malley. I think if you look at the order, what he was saying is that that was the deadline. That was the point by which they could file a motion for leave to amend. And if the order... And isn't that when they did? Well, respectfully, Judge O'Malley, I think what he was saying is, I will entertain the motion if you file it by then, but he ultimately concluded that the motion shouldn't be granted because one of the things that they would have needed to show in the motion was just cause because the Rule 16 standard applied. The deadline for an amended complaint was the deadline that they had agreed to. But to the extent the court relied on timeliness, that was wrong, right? Maybe there's a diligence issue, but to the extent he said it was untimely, that was just wrong. Well, Judge O'Malley, I didn't read his opinion as saying that they had filed their motion in an untimely way. I read his opinion as saying that you didn't satisfy the just cause standard because you didn't exercise diligence. But I didn't read him as denying their motion as being untimely as opposed to that they didn't exercise sufficient diligence in the time for which they filed an amended complaint because they should have done all of this beforehand. And my colleague on the other side makes a number of statements about how he couldn't imagine that reverse engineering was really what the district court required. But, of course, not only is that what the district court specifically said at Appendix 533, but, indeed, this came up in the motion to dismiss hearing. And there was no argument in the motion to dismiss hearing that they did not think that they were required to reverse engineer. In fact, Sonia's counsel specifically argued at Appendix 533. Counsel, I understand that, but the question is whether the court told them to do it or whether they thought they were supposed to do it. The question is whether or not it's appropriate to require it at the pleading stage. I mean, I can tell you that I have never seen a requirement that someone actually disclosed source code in a pleading. I mean, it's almost like the court was conducting discovery and trial at the pleading stage. No, Judge O'Malley, I understand the concern. Let me try to assuage it in a couple of ways. First of all, the district court did not tell them that they had to use source code and that they had to plead things about source code. He did say that they needed to plead why they thought something was in a particular place. What is their basis? For example, with the 540, what is their plausible reason for alleging that it's not on the motherboard but instead on some other board? Why do they think it's there? I mean, they have to know the answer to that question in order to come into court in the first place. And that's what he was asking for, and he specifically told them at Appendix 532, and he reiterated this at Appendix 10 in his opinion, that if they couldn't explain why they—if they couldn't allege something, then they could explain why it was that they could not do so. And so we're not talking about a situation like KTAC where I know this court was concerned that somebody shouldn't just be able to hide things and therefore avoid a complaint being filed against them at all. And, of course, they never raised such a concern. When he told them— Can you point us to any case where we have ever said that in the absence of pleading source code at the pleading stage that there's no way to allege infringement? Well, certainly, Judge O'Malley, this court has never said that. This court has had a very few number of cases that really address the pleading standards and really none in the context of this particular type of technology, which is very far removed from what was at issue in, say, for example, this disease, which itself noted that you dealt with a very simple technology, and you could look at a picture and understand what the basis for the allegations were. Here, they tried to run that play, but, of course, you can't look at a picture of the hard drive, as they suggest, at Appendix 636 and know that anything is there, either for the 540 patent or the 990 patent. And you can't look at a picture— So let me—this is Judge Teich. Let's talk about the 990, the 988, and the 670. If, in fact, they don't have to allege source code to have satisfactory allegations with respect to those patents, and they don't seem to have the same problem that they do with the 540 of making contradictory allegations, what's wrong with the allegations of a first-amendment complaint with respect to those three patents, the 990, the 988, and the 670? Sure. So let me break them up, Judge Teich, because the 990, I think, is very similar and suffers from many of the same problems as the 540. I think the other two are closely related to themselves. And starting with the 990, you do have the type of inconsistency in the sense that if you look at Appendix 660, paragraph 106Q, what they allege is that the PlayStation 4 itself implements the mutual authentication separate from the authentication program that's on the flash memory. And, of course, the flash memory is the alleged removable storage medium that has the game. And the issue here with these patents and with respect to the accused product is that you have to have—it's very unusual for an electronics patent. It's not just that there has to be a functional relationship between these programs. It's that they have to physically be on certain devices. And he already, in fact, said this in his argument earlier today, conceded that there are, quote, multiple authentication programs. And, of course, they have allegations that there are multiple removable disks and storage mediums. And so the question is, what is the plausible basis for asserting it's on this one instead of that one? In other words, what is the basis for saying it's on the one with the game as opposed to the more natural place for it to be, which is actually just on the device itself? And that is, of course, what they alleged at Appendix 660, paragraph 106Q. So I think you have the exact same issue in terms of pleading themselves out of court in the words of NALCO. But even if you don't agree with that, you still have the question— Okay, but let's talk about the 988 and the 670 specifically. There are no contradictory allegations there, right? Well, I think with respect to those, I don't know if this is diametrically— Wait, wait, answer my question. Do you contend that there are conflicting allegations as to the 988 and the 670? Judge Dyke, I don't think they are as squarely conflicting as with respect to the 990 and 540, which are squarely conflicting. What's wrong with the allegations as to those two patents? So a couple of points, Judge Dyke. So first, you do have them alleging at paragraph 128F on Appendix 684 that parts of the game are loaded at different times upon request. And whether that is directly contradictory, it is certainly inconsistent with or at least belies the notion of thinking that the fault program is done before the game ever starts executing. Let's assume that we conclude that there are no contradictory allegations for the 988 and the 670. What's wrong with the allegations? Well, Judge Dyke, what's wrong with the allegations is that they still have not fled an answer to the question of why do they think that the fault inspection program is done before the game starts? Or to put it the other way around, why do they think that the game doesn't start before the fault inspection program is complete? What more should they have said? I'm sorry, Judge O'Malley? What more should they have said? At the pleading stage. Well, I think this comes to what does it mean for somebody to plead plausible allegations as opposed to just asserting conclusions. But in NALCO, we did say it doesn't have to be probable. It just has to pass the line to plausibility, right? Well, I think that's certainly true and that's consistent with what the Supreme Court said in both Twombly and Iqbal. And, of course, what Iqbal says is it's not that something has to be fanciful to disentitle it to the presumption of truth. It's the conclusory nature of the allegation that disentitles it to the presumption of truth. And, you know, with respect to the 540 and the 990, of course, it's at least as likely as not that they be on the main device itself because, you know, the whole point of the invention was to move it off to a special board for manufacturing reasons. For these, the question is why have they nudged it, in the words of Twombly, past possibility to plausibility to think that the fault inspection program has finished, has completed, before the game has started other than just simply say so. And that's the problem. They don't point to anything, like in a user manual, they don't point to anything from which you can draw the inference that the game program doesn't start before the fault inspection program concludes. But if you didn't understand the nature of their allegations, I mean, you knew what they were alleging, right? I mean, you didn't seek to dismiss the first complaint. You understood what they were saying. Whether you think they were going to be able to prove it or not is a different question. Well, Judge O'Malley, two points in response. First, you know, this case was originally filed in another court. Sony filed a motion to transfer, you know, without... May I continue, Your Honor? Yes, go ahead. Well, let me just add one piece to my question, and that is, I mean, you moved for summary judgment of non-infringement, at least as to some claims. I mean, you understood what they were saying about how the system operated, right? Well, Judge O'Malley, the district court certainly didn't deny their motion to... to all of the claims, and we certainly did afterwards, you know, move for summary judgment on the patents that remained in the case. Now, I think one of them they actually had voluntarily dismissed, and then the summary judgment was focused on 101 with respect to the 363 patent. But with respect to the first question, or the first part of your question, Judge O'Malley, you know, obviously there's a strategic choice that anyone has to make when you're filing a motion to transfer of whether to motion to dismiss and run the risk of having the court dig into it and decide the case... decide the motion to dismiss issue, and then that would become a basis for denying a voluntary 1404 transfer motion. And so when the court did grant the motion to transfer, the district court applying Ninth Circuit law, like Sparling v. Hoffman and Wong v. Bell, you know, properly of its own initiative, noted the inadequacy of the complaint, and actually did more than what the Ninth Circuit contemplates. He didn't simply dismiss it after giving them notice. He gave them the opportunity to replead, and he gave them as much time as they wanted to replead. Any of these issues of whether they had adequate time and so forth, he gave them exactly the time that they asked for. And so I think the fact that we didn't originally move to dismiss when, of course, we still had the right to file a Rule 12c motion if it had come to that, there's no significance to be drawn from that, Judge O'Malley. Okay. And unless my colleagues have further questions, I think we're out of time. Okay. Hearing none, Mr. Andre, you have two minutes. Thank you. And just very briefly on the 363 patent, Judge O'Malley, you are correct. They did file a summary judgment of non-infringement on that, and they did it based on the fact they knew exactly what was being pled in the case. With respect to the 363, it is drawn to an actual machine that changes future games. This is a dynamically change that happens, and it were a combination of specific steps, and that was not the case. Well, let's talk about the things that were actually discussed in your opening argument. I mean, Mr. Quinn did not get to the 101 issue. What about his comment on the 990? Do you believe that the same kind of apparent inconsistency appears as they allege it appears as to the 540? No, Your Honor. I don't think there's inconsistencies at all. I think you can do alternative pleadings, and you can say that authentication programs reside on the removable disk, the hard drive, and that's what it is, and it can also reside on the motherboard. Judge Lynn asked earlier about the appendix in the red line version of it, where we showed that the removable hard drive has the authentication program. We showed that in appendix number 2609, where we actually showed the kernel. We did show that, and there is not inconsistency in authentication. Is it possible that here it's not a question of whether you pled enough, but the fact that you pled too much, that you might have, as Mr. O'Quinn said, pled yourself out of court with respect to some of these patents? Well, I don't think it's required that the motherboard not have authentication. The motherboard can have authentication. We pled in the original pleading that was answered, the amended complaint and the second amended complaint, that the board, including memory with authentication program, was present in multiple places. So, I think we met the pleading standards, and the one-on-one issues, I think, are also inappropriate for summary judgments. Thank you. I appreciate the court's time. Is there further questions? All right. Thank you, Mr. Andre. Thank you, Mr. O'Quinn. The case is submitted. The Honorable Court is adjourned from day to day.